The second case for argument today is Michael Gibbons v. Andrew M. Saul, Commissioner of Social Security, number 19-1885. Good morning. Please support, counsel. This is a pain case in which the ALJ's decision is built on a house of sand. Her primary reliance is on the opinion of Dr. Bolinski, a state agency doctor, whose opinion she gives great weight to. And Dr. Bolinski, when you read his decision or read his opinion, he does not make any connection at all with regard to any of the matters that he has cited in terms of how they impact the claimant's ability to function, matters of that sort. She cites it. She then says that it's consistent with the record as a whole and simply puts brief citations to the record by exhibit number without any explanation at all. Ironically, you know, one of the very last of those seven citations is the physical therapy note for Mr. Gibbons in which it's noted that he has a disability rating of 32 over 50, which when you multiply it by 2 puts him at 64 percent, which is classified as severe. He is noted to be lying down and reclining both during all day and all night. And he has limited range of motion. Extension is 90 percent limited. Rotation is 75 percent limited on the right and 80 percent on the left. Right side bend is 50 percent limited. Left side bend is 75 percent limited. He's on all sorts of narcotics, fentanyl patch, you name it. And the judge for the way she has gone about this in terms of giving great weight to Dr. Gibbons is not supported by the requirements of 404.1527C in terms of weighing opinions. It's just simply not done. And as a consequence, his opinion is just simply not remotely reliable. The other aspect of her analysis of the evidence that she goes through it is she fails to look at the significant downward trend that Mr. Gibbons undergoes. He had a surgery in August, and as natural doctors are hopeful after surgeries, I mean if somebody's had a surgical injury, they typically know right then and there. But in terms of the effectiveness of the surgery, that is a progressive matter. So we have the surgery in August and we have him giving the limitations. I wouldn't call them certainly an FCE, but limitations in November, although he does say that he can return to work, but when he sees them in January, he's noting atrophy of the arm and limitations, and in April, he takes them off work. And the judge in her analysis takes a worker's compensation opinion that is in January, and between those events, the surgery and Dr. Rue taking Mr. Gibbons off work, and says, oh, it's consistent with Dr. Rue's opinion back when he first released him after the surgery. Again, there's an arc of recovery from surgery, and it didn't happen. He was progressing. They started to note that, gee, you're having all these issues, you're having atrophy, do a CT scan, oh, you've got, now we're noting severe stenosis at a level above that. We're noting a screw that's hitting a nerve that's from the earlier surgery. None of those matters were taken into account. So as a consequence, we have an ALJ's decision that is simply not supported and is not consistent with the record. Mr. Sutterfield, can I ask you to react to something? Sure. It's, I understood one of your main points on appeal, these are my words, not yours, to be that Mr. Gibbons can't reach over his head with his left arm, not his right arm. And the reason that I'm asking you that is because when I look at that appeal counsel, the appeals counsel's modification, they modify the ALJ opinion to say that he can't reach overhead with his right arm. And I seem to read your brief to say, well, maybe, maybe not, but I'm focused on the left arm as well as the right arm, and nobody's addressing the left arm. Am I on to something or not on to something? Well, I guess to some extent, yes. I mean, I think as from a reality standpoint, I think you'd have a vocational expert indicate that there would still potentially be jobs if that were the only limitation in terms of reaching overhead with a single arm. You know, so when, given his situation, I don't know that that is a make or break issue in terms of the scheme of the case. I really don't. I think that the issue is more in terms of, let's assume he had no atrophy of his arm. He's still on fentanyl patch. He's still on the other pain medications. He still has significantly limited range of motion. And he's noted without criticism in physical therapy to be spending most of the day lying down and reclining, which makes sense. If you have pain in your neck, you're going to want to support your head, neck, and shoulders. I don't know any way to do that other than by lying down or reclining, which is certainly inconsistent with any kind of work. Mr. Sutterfield, though, isn't the arm issue still important in the sense that it goes to what Dr. Belinsky's, you're arguing, the incorrect nature of his pinion? If Dr. Rue finds there's no atrophy in the hands, but stated there was atrophy in the left upper arm, and at AR 281, seems to indicate, listen, there's a medical record that supports that. So the atrophy issue on the arm also goes to whether or not Belinsky can be relied upon, correct? Well, that's correct. I mean, in that scheme, in terms of my attack on Dr. Belinsky, for certain. But in terms of the bigger scheme of things, I think there's so many other devastating things going on with Mr. Gibbons that that becomes, that's a manifestation. I mean, you don't get atrophy without significant impingement on a nerve, for certain. And you also have the issue, is there winging of the scapula or not winging of the scapula? That is ping ponged throughout these medical records. And again, it can become, it's kind of like going to a cherry tree and trying to pick out your favorite cherry. There's a lot here. So I think that my response is more along those lines. Yes, Your Honor, it is important because it goes to the minimalist inaccuracy of Dr. Belinsky's analysis of this case. With nothing further, I mean, again, I think that is the primary thing. I did note that they had issues regarding Dr. Farbar's. I'll reserve those. I believe they'll be addressed, and I'll reserve that for rebuttal. Counsel, if there's something where you're making the argument, I think you need to make it in your opening argument. You're the appellate here. Okay, I'll do it very briefly. If there's nothing to add to your brief, that's fine, but you don't get to hold everything back for rebuttal. I appreciate that. I appreciate that. In terms of the issue on Dr. Farbar's opinion, one of the matters that they note is that they indicate that he stated that Mr. Gibbons can never lift, and he's using the Social Security sanctioned form, and it's got a grid to it, and across the grid is going the frequency, and at the far left, you have continuous, and then you have frequent, and then you have occasional, and you have never. They don't have something, and occasional is up to a third of the day. They don't have a category, for example, up to a sixth of the day. And then you have your lifting requirements in terms of weights that are set forth in that form, and where the 10-pound weight and the continuity frequency aspects come together, he marks never. Again, if someone could lift 10 pounds but only do it a sixth of the day, that form doesn't allow you to mark never. Your argument is, even though I got the box right in front of me, even though the box never is checked, never doesn't mean never. Correct. And if you took it to the extreme, if you eliminated all but the continuous, and you had continuous, and can that person do that, never essentially equates to no. And your overarching point is there, what's his name, Farhabar? Yes. There's no inconsistency. The inconsistency, the ALJ found, is not there in your view. Correct. Thank you. Thank you. Thank you, counsel. For the commissioner, Mr. Leavitt. Good morning.  May it please the court. The ALJ here was faced with multiple conflicting medical opinions. She couldn't possibly give restrictions that were identical with each and every one of those opinions. So she did what she was supposed to do under the regulations, which was weigh the opinions. The question here is not whether the court would have come to the same weighing as the ALJ. Rather, the ALJ's weighing was one reasonable course when looking at the evidence. If this court finds that the ALJ was reasonable and took a reasonable course, then the ALJ and the commissioner should be affirmed. Here the ALJ looked at the opinions, and she gave more restrictions than examining neurosurgeon Dr. Deutsch. Very similar restrictions to reviewing physician Dr. Belinsky. Much the same restrictions as treating neurosurgeon Dr. Rube, and she discounted the extreme restrictions of neurosurgeon Dr. Farivar, who saw Mr. Gibbons twice. Now, turning to Dr. Deutsch, based upon Dr. Deutsch's own examination and review of the records, he limited Mr. Gibbons to lifting only 40 pounds. The ALJ more than accommodated this opinion because the ALJ restricted Mr. Gibbons to lifting a maximum of 20 pounds occasionally and 10 pounds frequently. Additionally, the ALJ gave numerous other limitations not indicated by Dr. Deutsch. So Dr. Deutsch definitely supports the ALJ's decision. The ALJ also looked to reviewing physician Dr. Belinsky, who gave his opinion after the other opinions referenced in the briefs here. The ALJ adopted Dr. Belinsky's opinions in numerous areas such as lifting, carrying, climbing, balancing, stooping, kneeling, environmental limitations, reaching, and handling. Dr. Belinsky explained that he based his opinion upon a review of the evidence, and as I just mentioned earlier, it was in December 2014, which was after many of the opinions in this case, and it was reasonable for the ALJ to cite this opinion. Can I ask you a question? Yes. I'm looking at, I think, page 75 of the record, which I think is Dr. Belinsky's report, and in the paragraph that says explain exertional limitations, Dr. Belinsky keeps referring to the claimant with feminine pronouns. She had been treated with nerve blocks. She is asymptomatic at this time in other respects. Is that right? Am I misreading that? No, Your Honor. That is correct. And that's Dr. Belinsky's report? That is Dr. Belinsky's report, and there is a she in there, and it should have been a he. However, that doesn't mean that Dr. Belinsky... Was Dr. Belinsky wrong about the dominant hand? What didn't he say? There was no atrophy? Well, there was no atrophy on the date where he's referring to, which is April 1st, 2014. Maybe I'm confused. I thought there was pretty clear evidence of atrophy in the dominant left arm by somebody who examined. Right. So on page 75 in the second paragraph under explain exertional limitations, it refers to a follow-up on April 1st, 2014, and then it continues on to page 76, which I think Your Honor was referring to as a comment of no atrophy. So that particular exam, no atrophy was noted. But Dr. Belinsky, again, had to review all the medical records, and his decision... He didn't examine it, though. That's correct. Okay. Go ahead. No, I think I have the same... Dr. Rue, I think around that same time, absolutely found atrophy based upon an exam, right? Right. And while the ALJ is consistent with Dr. Rue's lifting... I'm sorry. Dr. Belinsky is consistent with Dr. Rue's lifting limitations. Dr. Belinsky restricted Mr. Gibbons to lifting 20 pounds occasionally and 10 pounds frequently, and Dr. Rue had allowed either 30 or 40 pounds of lifting. That was short... Okay. And is there any dispute that throughout this time Mr. Gibbons needed pretty heavy-duty narcotic pain relief, including the fentanyl patch? Your Honor, there is no dispute that Mr. Gibbons required significant medications, and the ALJ considered that throughout his opinion. And Dr. Rue did not... with some ability of work despite these heavy medications. And although this was not raised in the briefs, Dr. King, who was Mr. Gibbons' primary pain relief physician, said that the pain medications would result in Mr. Gibbons being unable to operate heavy machinery or drive. Those were restrictions that Dr. King gave based upon the medications, and the ALJ adopted those limitations in her residual functional capacity. Let's see. What's the medical evidence in your view that he can lift overhead with his left arm? Well, that's based on Dr. Deutsch's opinion, who examined Mr. Gibbons, and he said that he disagreed with Dr. Rue on any sort of overhead lifting limitation. Dr. Deutsch said that Mr. Gibbons could lift 40 pounds without any reference to a... Did Dr. Deutsch, though, expressly say he can lift overhead? I'm not sure if he said expressly that he could lift overhead, but he was giving a workman's compensation opinion in his final limitation. But isn't the ability to lift overhead significant in the RFC? It's not just a matter of can I get 40 pounds right off the ground an inch, right, for purposes of working. In other words, lifting overhead is meaningful as a functional matter in one's ability to work, correct? That's correct, Your Honor. And despite it being a, as Your Honor noted, a very significant Dr. Deutsch, very significant ability, Dr. Deutsch did not note any limitation in that ability after he examined Mr. Gibbons. So the ALJ's allowance for overhead lifting and reaching was supported by Dr. Balinski and Dr. Deutsch. Now the ALJ recently discounted Dr. Farivar's extreme limitations. Dr. Farivar had, of course, examined Mr. Gibbons twice. But despite observing no gait issues, Dr. Farivar gave extreme limitations, such as being unable to either walk at all or walk for only one hour in a day, sit for one hour a day, stand for one hour a day. That was outside of what would be supported by the record. And the ALJ, I'm sorry, Dr. Farivar also noted a number of pulmonary restrictions despite no evidence of that. So it was within reason for the ALJ to discount Dr. Farivar's opinion. So Mr. Gibbons' argument amounts to a request that the Court reweigh the medical opinions. This Court has soundly rejected similar requests on numerous occasions. Therefore, the Commissioner prays that the Court affirm the ALJ's decision, which was consistent with the opinions of Dr. Deutsch and Dr. Balinski in a number of areas with Dr. Ruth. So if the Court has any further questions. Thank you very much, Mr. Leavitt. Rebuttal, Mr. Sutterfield. Thank you. As I noted in my opening remarks, this is a pain case. And I would certainly, as noted in the physical therapy records of fall of 2014, which were ordered by Dr. Farivar, they recount that Mr. Gibbons needs to lie down and recline. I don't know how people can lie down and recline and walk. So I think it's fair for him to restrict walking. That's certainly the context that, you know, how do you treat this patient? And if that is how a patient finds comfort by lying down and reclining, they're already on fentanyl patch and other narcotics, that's appropriate. It's not, it goes to its functionality. It's not, you know, any standard walk further, you know, if it's not functional, whether it's marked, you know, none or two hours out of eight, it doesn't matter if it's going to be interrupted with the need to lie down and recline. Thank you. Okay. Thank you, counsel. The case is taken under advisement.